No. 25-10674

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————————

THE VISIONARY, BOOKS + CAFE, LLC,

*Plaintiff-Counter Defendant-Appellant,*

– v. –

BANK OZK,

*Defendant-Counter Claimant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA IN CASE NO. 1:24-CV-00014-SEG
(HONORABLE SARAH ELISABETH GERAGHTY)

## OPENING BRIEF OF APPELLANT

ARTHUR A. GARDNER
Georgia Bar No. 283995
CHARLENA L. THORPE
Georgia Bar No. 760954
GARDNER THORPE
*Attorneys for Appellant*
2300 Windy Ridge Parkway, SE, Suite 1135 South
Atlanta, Georgia 30339
(770) 984-2300
artg@gardnerip.com
charlenat@gardnerip.com

The Visionary, Books + Cafe, LLC v. Bank OZK, Case No. 25-10674

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

The following is a complete list of all persons and entities known to the filer to have an interest in the outcome of this appeal.

Adam and Reese LLP

Bank OZK

Bingham II, Ron C.

Gardner, Arthur A.

Gardner IP Law, PC

Gardner IP Law, PC d/b/a GARDNER THORPE

Geraghty, Honorable Sarah E.

Incorporating Innovation LLC

McLeod, Aaron G.

Rolle, Kandaria

The Visionary, Books + Cafe, LLC

Thomson, John

Thorpe, Charlena L.

The Visionary, Books + Cafe, LLC v. Bank OZK, Case No. 25-10674

Dated: <u>May 22, 2025</u>        By: <u>/s/ Arthur A. Gardner</u>
                               Arthur A. Gardner

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant The Visionary, Books + Café, LLC, respectfully requests oral argument.  This case presents important issues regarding the proper deference to give a non-CBA arbitration award or an arbitration award where the parties did not agree to empower the arbitrator to interpret the contract. The deference articulated in most appeals of arbitration decisions has roots in collective bargaining agreement (CBA) cases.  CBA cases have different circumstances, objectives, and policy considerations at play than in most non-CBA cases, and different standards for judicial deference should attach.  For example, in CBA cases, the parties (typically an employer and a labor union) specifically agree to empower the arbitrator to interpret the contract.  The parties in CBA cases are in a long-term relationship that will continue long after the arbitral matter is over.

Oral argument will assist this Court to resolve these important legal issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT (CIP) ...........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES ........................................................1

I.      JURISDICTIONAL STATEMENT ..................................................2

II.     STATEMENT OF THE ISSUES ....................................................2

III.    STATEMENT OF THE CASE .......................................................3

    A.      The COVID-19 Pandemic Impacted Visionary ...................................3

    B.      The Account Agreement between Visionary and Bank OZK..............3

    C.      Visionary is Awarded an SBA Grant and Bank OZK
        Confiscates the Funds from Visionary's Account ..............................7

    D.      Bank OZK Acted Upon Its Misunderstanding of the RRF
        Program ............................................................................9

    E.      The Arbitration .................................................................11

    F.      The District Court Proceeding................................................15

    G.      Notice of Appeal ...............................................................16

IV.     STANDARD OF REVIEW ..........................................................16

V.      SUMMARY OF THE ARGUMENT .............................................16

VI.     ARGUMENT.............................................................................21

    A.      District Court Made No Inquiry Into the Panel's Powers, Nor
        Whether Those Powers Were Exceeded ..........................................21

    B.      The Panel Exceeded its Powers by Making an Award That
        Contradicts and/or Ignores the Plain Language of the Account
        Agreement ...........................................................................29

C.    The Panel Exceeded its Powers by Making an Award That Contradicts a Result <u>Compelled</u> by the Plain Language of the Account Agreement .............................................................. 31

D.    The Panel Exceeded its Powers by Applying the "NACHA Rules" Instead of the Actual Account Agreement, Despite the Term "NACHA" Not Appearing in the Account Agreement ............. 32

E.    The Panel Exceeded its Powers by Construing the Account Agreement At All .................................................................. 37

    1.    Bank OZK's Account Agreement Imparted No Power to Construe the Account Agreement, Nor Did the Arbitration Rules ....................................................... 37

    2.    Unlike in Collective Bargaining Agreement Arbitrations, Here the Panel Was Given No Power to Interpret the Account Agreement .............................. 39

F.    The *Funds* Belonged to Visionary, Not to Bank OZK or the SBA, When Bank OZK Confiscated the Funds from Visionary's Account .......................................................... 40

    1.    UCC Article 4A Controls When Title Passed to Visionary .................................................................... 40

    2.    The Panel's Findings Establish That Visionary Had Title to the Funds as Early as May 24 or May 25, 2021 ............ 46

    3.    The Panel Provides No Reasoning in its Award Regarding the Propriety of Bank OZK Removing Funds from Visionary's Account After Title Had Transferred to Visionary .......................................... 48

G.    Trying to Make Sense of the Actions of Bank OZK and the Panel ................................................................................ 50

VII.    CONCLUSION............................................................................. 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aleo Intl. v. Citibank,*
    612 N.Y.S.2d 540 (1994)................................................................ 41, 44, 48

*Bayerische Hypo-Und Vereinsbank AG v. HSBC Bank USA, N.A.,*
    2015 N.Y. Misc. LEXIS 2602 ........................................................ 42, 48, 49

*BGT Grp., Inc. v. Tradewinds Engine Servs., LLC,*
    62 So. 3d 1192 (Fla. Dist. Ct. App. 2011)....................................................33

*Butterkrust Bakeries v. Bakery, Confectionery and Tobacco Workers Int'l.,*
    726 F.2d 698 (11th Cir. 1984) ................................................................26

*Eastern Associated Coal Corp. v. Mine Workers,*
    531 U.S. 57 (2000)................................................................ 21, 22

*First Options of Chicago, Inc. v Kaplan,*
    514 U.S. 938 (1995)................................................................ 25, 29

*Gherardi v. Citigroup Global Mkts.,*
    975 F.3d 1232 (11th Cir. 2020) ....................................................27

*Global Quest, LLC v. Horizon Yachts, Inc.,*
    849 F.3d 1022 (11th Cir. 2017) ................................................ 33, 34

*In re Grubbs Cont. Co.,*
    319 B.R. 698 (M.D. Fla. 2005)................................................................44

*In re Pillowtex, Inc.,*
    349 F.3d 711 (3d Cir. 2003) ................................................................44

*In re QDS Components, Inc.,*
    292 B.R. 313 (W.D. Ohio 2002)................................................................44

*Middle East Banking Co. v. State Street Bank Int'l.,*
    821 F2d 897 (2d Cir. 1987) ................................................................48

*OBS Co. v. Pace Constr. Corp.,*
    558 So. 2d 404 (Fla. 1990) ................................................................34

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    559 U.S. 662 (2010)................................................................ 25, 29

*Studco Bldg. Sys. US, LLC v. 1st Advantage Fed. Credit Union*,
    2025 U.S. App. LEXIS 6999 (4th Cir. 2025) .................................... 41, 42, 43

*Szuts v. Dean Witter Reynolds, Inc.*,
    931 F.2d 830 (11th Cir. 1991) ............................................................... 27, 39

*United Steelworkers of America v. American Mfg. Co.*,
    363 U.S. 564 (1960) ..................................................................................... 23

*United Steelworkers of America v. Enterprise Wheel & Car Corp.*,
    363 U.S. 593 (1960) ..................................................................................... 24

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) ............................................................................... 23, 24

*Warrior & Gulf Nav. Co. v. United Steelworkers of America*,
    996 F.2d 279 (11th Cir. 1993) .............................................................. 26, 31

*Wiregrass Metal Trades Council AFL-CIO v.*
    *Shaw Envtl. & Infrastructure, Inc.*,
    837 F.3d 1083 (11th Cir. 2016) ....................................................... 16, 26, 27

*Zeal Global Servs. Private Ltd. v. SunTrust Bank*,
    508 F. Supp. 3d 1303 (N.D. Ga. 2020)................................................ 42, 44, 49

**Statutes & Other Authorities:**

9 U.S.C. § 10(a)(4) ............................................................................................ 29

28 U.S.C. § 1291 ................................................................................................. 1

28 U.S.C. § 1332 ................................................................................................. 1

O.C.G.A. § 11-4A-209.................................................................................. 44, 48

O.C.G.A. § 11-4A-209(b)(1) .............................................................................. 45

O.C.G.A. § 11-4A-209(b)(2) .............................................................................. 45

O.C.G.A. § 11-4A-404(a) ......................................................................... *passim*

O.C.G.A. § 11-4A-404(c) ...................................................................... 35, 42, 45

O.C.G.A. § 11-4A-405(a) .................................................................................. 43

O.C.G.A. § 11-4A-405(b) .................................................................................. 43

Fed. R. App. Proc. 4(a)(4)..................................................................................... 1

Federal Arbitration Act § 10(a)(4) ................................................1, 16, 22

Georgia Commercial Code § 11-4A-209(b) ...........................................43

Georgia Commercial Code § 11-4A-405(a) ...........................................43

UCC Article 4 ........................................................................................35

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding in the lower body that is the subject of this appeal was previously before this or any other appellate court. There is no case known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# I.  JURISDICTIONAL STATEMENT

Subject matter jurisdiction in the district court existed in diversity. 28 U.S.C. § 1332. The Visionary, Books + Café, LLC ("Visionary") is a corporation of the State of Georgia; Bank OZK is an Arkansas corporation; and the amount in dispute exceeds the statutory amounts. This Court has jurisdiction because this is an appeal from a final judgment. 28 U.S.C. § 1291. An omnibus order and a separate final judgment filed by the District Court on January 30, 2025, disposed of all claims. Visionary's notice of appeal, filed on March 1, 2025, is timely as to all aspects of the omnibus order and the final judgment. Fed. R. App. Proc. 4(a)(4).

# II.  STATEMENT OF THE ISSUES

Under Section 10(a)(4) of the Federal Arbitration Act, a district court may vacate an arbitration award where an arbitration panel "exceeds its powers." An arbitration panel "exceeds its powers" where it issues an award that ignores, contradicts, or modifies the express language of the parties' agreement or where it makes an award not authorized by the contract from which it obtains its power. Here the Panel did both. The issues presented in this banking dispute are whether the District Court committed reversible errors when it improperly affirmed the arbitration award by (1) failing to assess the scope of the powers conveyed to the arbitrators via Bank OZK's Account Agreement with Visionary and by failing to

assess whether the arbitrators exceeded those powers; and (2) by applying an inappropriate legal test.

### III.  STATEMENT OF THE CASE

#### A.    The COVID-19 Pandemic Impacted Visionary

In 2020 and 2021, restaurants and other food businesses suffered economic hardship resulting from the COVID-19 pandemic. *See* U.S. Gov't Accountability Office, GAO-22-105442, Restaurant Revitalization Fund: Opportunities Exist to Improve Oversight at 4 (2022). Visionary was one such planned restaurant.

Visionary was envisioned to be an upscale bookstore and cafe.  (Doc. 13-5 at 2.) The founder of Visionary, an experienced bookstore and café owner with decades of restaurant experience (*see* Docs. 13-1, 13-2, 13-3), had been planning for the opening of Visionary since at least as early as 2017.  (*See* Docs. 13-5, 13-6, 13-7.) Visionary incorporated in the State of Georgia on January 28, 2020 (*see* Doc. 13-4), long before any knowledge that a pandemic would shut down the country for 2+ years.  The initial planned opening of Visionary was impacted by the COVID-19 pandemic and the subsequent mandatory government shutdowns.

#### B.    The Account Agreement between Visionary and Bank OZK

On September 15, 2020, Visionary opened a business account with Bank OZK at a branch near the planned location of the restaurant.  (Doc. 12-1 at 8.) To that end, Bank OZK and Visionary entered into a "contract of adhesion" where the terms of the agreement were not negotiable or "bargained for" by Visionary.  Instead, Bank

OZK dictated the terms of the agreement in various documents it gave Visionary as a condition for opening the account. One such document was a "Terms and Conditions of Your Account" form document (hereinafter, "Account Terms and Conditions"). (*See* Doc. 13-8.) Another document was an "Additional Disclosures" form document. (*See* Doc. 13-9.) These documents, along with three other form documents[1] given to Visionary, together were defined by Bank OZK as constituting the "account agreement" or just "agreement" (referred to hereinafter as "the Account Agreement" or "the Contract"). (*See* first sentence Doc. 13-9)(providing, "This addendum, together with the account terms and conditions and all other documents, disclosures, schedules, and agreements pertaining to your account *constitute the account agreement* (collectively, the 'agreement').")(emphasis added).

Paragraph 2 of the "Account Terms and Conditions" form provides, "This document, along with any other documents we give you pertaining to your account(s), is a contract that *establishes rules which control your account(s)* with us.". (Doc. 13-8 at ¶2) (emphasis added).

The Account Agreement provides at Paragraph 21 (*see* Doc. 13-8 ¶21):

(21)   ACH and Wire Transfers

This agreement is *subject to Article 4A of the Uniform Commercial Code - Fund Transfers* as adopted in the state in which you have your

---

[1] The other three documents that Bank OZK gave to Visionary were documents titled Funds Availability Policy Disclosure (*see* Doc. 13-10), Business Debit Card Agreement, and Schedule of Fees. (*See* Doc. 12-1 at 8.)

account with us. ... You agree to be bound by automated clearing house association rules. *These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code.* If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. ...(emphasis added)

Thus, although the Account Agreement has multiple specific references to UCC-4A, the Panel stated, "Under Paragraph 21 [of the Account Agreement], Visionary also agreed to be bound by the NACHA rules . . . ." (Doc. 12-1 at 14-15.) The Panel also found "to the extent there is a conflict between Article 4A of the Georgia UCC and the NACHA Rules, the NACHA Rules governed Bank OZK's handling of the V-ACH, and not Article 4A of the Georgia UCC." (*Id.* at 16.)

However, *the term "NACHA" does not appear in the Account Agreement at all, let alone any provision in the Account Agreement that says that NACHA would control over Georgia UCC-4A.* The Account Agreement makes no reference to "NACHA rules".[2] (*See* Doc. 13-8 through 13-10.) Instead, the Account Agreement itself provides its own specific interpretation of "automated clearing house

---

[2] NACHA is a private organization and stands for National Automated Clearinghouse Association. The "NACHA rules" are not public and only NACHA members have access to the rules without paying a significant amount of money to obtain a copy of the rules. (*See* Doc. 14-8 cover page (providing, "No part of this publication may be reproduced, retransmitted, transferred or displayed . . . without the prior written permission of Nacha.")

association rules." Paragraph 21 states, "These rules provide . . . that payments made to you . . . are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code." (Doc. 13-8 ¶21.)

The Account Agreement provides at Paragraph 10, "... **[I]f we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice."** ((*Id*. ¶10) (emphasis added).)

Thus, the Account Agreement provides that Bank OZK may freeze or close Visionary's account if Bank OZK suspects fraudulent activity.

Paragraph 37 of the Account Agreement (Terms and Conditions) provides that Bank OZK may place an administrative hold on funds in Visionary's account to allow a legal proceeding to determine a claim adverse to Visionary. (*Id.* ¶37.)

Paragraph 30 of the Account Agreement states:

(30)    Legal Actions Affecting Your Account

If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. . . . .

(*Id.* ¶30.)

Thus, the Account Agreement provides that Bank OZK may comply with legal action (e.g., a court order) or freeze the assets in the account until a final court determination regarding the legal action.

The Account Agreement *does not put Visionary on notice* that Bank OZK *might confiscate the funds* in Visionary's account *without a court order*. (*See* Doc. 13-8 through 13-10.)

## C.    Visionary is Awarded an SBA Grant and Bank OZK Confiscates the Funds from Visionary's Account.

To address the hardships caused to restaurants by the COVID-19 pandemic, the U.S. Government established the Restaurant Revitalization Fund (RRF) in March 2021 to support eligible entities affected by the COVID-19 pandemic. *See* U.S. Gov't Accountability Office, GAO-22-105442, Restaurant Revitalization Fund: Opportunities Exist to Improve Oversight at 5 (2022); *see also* Doc. 18-7 at 1. Congress appropriated $28.6 Billion to the U.S. Small Business Administration (SBA) to administer the RRF to provide emergency assistance to restaurants and businesses, *including restaurants that had not yet opened and were negatively impacted by COVID-19. See, e.g.*, U.S. Gov't Accountability Office, GAO-22-105442 at p. 1, 20, 30 fn. 38; *see also*, Doc. 18-6 at 3, 9; Doc. 18-7 at 8; Doc. 12-1 at 9. In fact, applications from businesses that had not yet opened received heightened scrutiny. *See, e.g.*, U.S. Gov't Accountability Office, GAO-22-105442 at p. 30 fn. 38, p. 33.

- 7 -

In May 2021, Visionary applied for funds under the SBA RRF program using the form for "Applicants That Have Not Yet Opened". (*See* Doc. 18-1 at 8.) In reviewing Visionary's application, the SBA, among other things, verified Visionary's address by running it through the US Postal Service database (*see* U.S. Gov't Accountability Office, GAO-22-105442 at 33), searched the IRS database (*Id.*), did a background check on Visionary's principal (*Id.* at 34), and had multiple people review the application and the underlying documentation for the application (*Id.* at 33). In fact, "The RRF Fraud Control Framework is comprised of best-in-class private sector and public sector databases that have been leveraged extensively and cited . . . as effective fraud data analytics tools." *Id.* at 72. In sum, the SBA had a rigorous fraud detection process. *See, e.g.*, *Id.* at 31-34. After doing all of this, the SBA found Visionary to be eligible for a substantial grant and awarded Visionary an RRF grant of $2.86 million. (*See* Doc. 12-1 at 9.)

The SBA transmitted the $2.86 million to Visionary via an incoming ACH *transaction* and Bank OZK deposited the *funds* into Visionary's account. (*See* Doc. 12-1 at 9, 10, 16, 20.) At a certain moment, legal title to the *funds* was transferred from the SBA (the sender of the funds) directly to Visionary (the recipient). At no point was Bank OZK the legal owner of the funds. Bank OZK then confiscated Visionary's funds from its account two days after depositing the funds in Visionary's account (*see* Doc. 12-1 n. 13, p. 17 ("Bank OZK removed the V-ACH funds from

Visionary's account . . . ."), thereby frustrating the goals of the SBA and the RRF – and violating UCC-4A. This confiscation occurred after title to the funds had passed to Visionary.

### D.    Bank OZK Acted Upon Its Misunderstanding of the RRF Program

Early federal COVID-19 relief programs (e.g., Paycheck Protection Program) were geared to support existing, ongoing businesses. Apparently, Bank OZK employees were unaware that the SBA's RRF restaurant grant program, a later implemented program, was designed to award grant money to restaurants *that had not yet opened* too (like Visionary). (*See* Doc. 18-4 at 4 (In probing the SBA regarding the RRF grant to Visionary, Bank OZK emailed the SBA stating, "The business did not provide us with a physical location for their operations . . . . [This] seem[s] to go against the Restaurant program requirements.").) So, when Bank OZK saw nearly $3M come into an account that had previously had virtually no activity (which raised the question of whether it was an operating business), Bank OZK employees suspected potential fraud and proceeded to take the money from Visionary's account and send it to the SBA. However, the SBA RRF program *was* intended to help companies like Visionary, companies who had not yet opened their restaurant when COVID-19 struck. *See, e.g.*, U.S. Gov't Accountability Office, GAO-22-105442 at 20, 30 fn. 38; *see also*, Doc. 18-6 at 9; Doc. 18-7 at 8; Doc. 12-1 at 9. *Visionary was exactly the kind of party that the SBA RRF program was*

*intended to help.* Unfortunately, Bank OZK failed to "stay in its lane" and proceeded to act on its misunderstanding of the SBA RRF program and without the authority of a court order in confiscating Visionary's money (after title to the funds had transferred to Visionary).

Unfortunately, at that time, the SBA was disbursing funds as quickly as it could and when Visionary asked the SBA to send the funds again, the SBA had no more money to disburse.

Bank OZK confiscated the funds in Visionary's account even after the SBA verified to Bank OZK that Visionary **was** the intended recipient (*see* Doc. 18-4 at 5 and after *the SBA declined Bank OZK's offer to return the funds (Id. at 2, 4)* and after the SBA specifically instructed Bank OZK to file a report if it suspected fraud instead. (*See Id.* at 2 near top right after the bulleted list (SBA instructing Bank OZK that "[y]ou can report the transaction as suspected fraud to the SBA OIG.".)) Apparently, Bank OZK acted solely on its own initiative on its mistaken belief that companies like Visionary were not entitled to these SBA grants.

If Bank OZK suspected fraud, under the Account Agreement it was permitted to place a temporary freeze on the funds in the account or on the account itself. But Bank OZK *had no right to confiscate Visionary's funds* under the Account Agreement, or under any law or rule.

**E.      The Arbitration**

After Visionary was unsuccessful in having the SBA re-send the funds before all the funds were allocated and Bank OZK refused to repay Visionary its money (*see* Doc. 14-5, 14-5), on March 16, 2022, Visionary instituted arbitration with the American Arbitration Association against Bank OZK based on Bank OZK confiscating (removing) Visionary's $2.86 million from its account.  (Doc. 12-1 at 1.)

In the arbitration, neither party requested an "interpretation" of the Account Agreement, in whole or in part, prior to or during the arbitration hearing. Indeed, neither party identified any portion of the Account Agreement as ambiguous and in need of interpretation. On September 19, 2023, a three-person Panel of the American Arbitration Association issued an arbitration Award (*see* Doc. 12-1) finding that:

(Finding 1) Visionary applied for and was awarded a grant under the federal Restaurant Revitalization Fund ("RRF") program administered by the SBA in the amount of $2,860,000.00 (*see* Doc. 12-1 at 9);

(Finding 2) The U.S. Treasury, on behalf of the SBA, transmitted the $2.86 million awarded to Visionary via a government automated clearing house ("ACH") *transaction* (a credit entry) to Bank OZK with Visionary as the beneficiary of the transaction (what the Panel has labeled the "V-ACH") (*Id.*);

(Finding 3) Bank OZK received the $2.86 million incoming ACH credit entry *transaction* on the morning of May 24, 2021 (*Id.*);

(Finding 4) Bank OZK promptly placed $2.86M in *funds* in Visionary's account on the morning of May 24, 2021 (in anticipation of the funds actually arriving soon from the SBA pursuant to the ACH credit entry transaction) and made the *funds* available to Visionary on the morning of May 24, 2021 (*Id.* at 20);

(Finding 5) Suspecting a potential for fraud based on certain circumstantial bits of information, just before noon on May 24, 2021, Bank OZK placed a hold on the account to prevent Visionary from accessing the *funds* (*Id.* at 10, 20);

(Finding 6) Bank OZK actually received the $2.86 million of *funds* for the incoming ACH from the U.S. Treasury on May 25, 2021 (*Id.* at 16);

(Finding 7) The ACH credit entry transaction was settled on May 25, 2021 (*Id.* at 18);

(Finding 8) Bank OZK contacted the SBA to try to determine if the transaction was fraudulent or not (and asked if the SBA wanted the bank to return the "deposit") (*Id.* at 11; *see also* Doc. 18-4 at 4);

(Finding 9) The SBA verified to Bank OZK that the incoming ACH was properly disbursed under the SBA's RRF program to Visionary (Doc. 12-1 at 11);

(Finding 10) On May 26, 2021, although the SBA had declined Bank OZK's offer to return the deposit (Doc. 18-4 at 2, 4) and although the SBA verified that the

ACH was properly disbursed to Visionary (*Id.* at 5), Bank OZK removed $2.86 million from Visionary's account anyway (Doc. 12-1 at fn. 12, fn.13, p. 17); and

(Finding 11) Under Paragraph 21 of the Account Agreement, Visionary agreed to be bound by the "NACHA rules". (*Id.* at 14-15.)

The Panel found in its Award in several places that the $2.86 million of *funds* was in Visionary's account. (*See* Doc. 12-1 at 10 ("Bank OZK placed a 'customer-facing' hold on the $2.86 million V-ACH in Visionary's account"); *see also*, Doc. 12-1 at 11 ("whether Bank OZK acted improperly with respect to . . . placing a hold on the V-ACH funds in Visionary's account"); Doc. 12-1 at 22 ("Because the Panel has found that Bank OZK acted properly and legally in . . . placing a hold on the amount of the V-ACH in Visionary's account")).

The Panel Award conspicuously avoided making any finding (one way or the other) of whether Bank OZK was permitted to *remove* the funds from Visionary's account pursuant to the parties' Account Agreement. The Panel Award also conspicuously avoided comparing the Account Agreement language with the actions of Bank OZK in confiscating the $2.86 million of funds from Visionary's account to assess *whether that confiscation was in violation of or in compliance with the Account Agreement*.

The Panel Award does not identify any purported ambiguity in the Account Agreement.

The Panel Award framed the issues as "Despite the numerous claims, the crux of this arbitration boils down to whether Bank OZK acted improperly with respect to its investigation of the circumstances surrounding the V ACH, placing a hold on the V-ACH funds in Visionary's account, ultimately returning the V ACH to the U.S. Treasury/SBA, and taking actions with respect to Visionary's account to accomplish the foregoing." (*Id.* at 11.)

The Panel Award does not appear to focus on the propriety of Bank OZK *removing* the $2.86 million of *funds* from Visionary's account, instead casting the issue as whether Bank OZK acted "reasonably" in "returning the ACH". Thus, for the most part, the Panel Award does not reference the removal of the $2.86 million from Visionary's account. The Panel Award only discusses the investigation, the hold, and then the "V-ACH return." The Panel Award made no finding with respect to the potential propriety of the Bank OZK removing $2.86 million from Visionary account to fund the "V-ACH return", nor how the removal of $2.86 million by Bank OZK from Visionary's account can be reconciled with the Account Agreement generally or with particular provisions of the Account Agreement.

*Further Facts*

The SBA did not ask Bank OZK to return the *funds*, via an ACH or otherwise. Instead, the SBA suggested that if Bank OZK suspected possible fraud, to report it in a particular way. (Doc. 18-4 at 2.)

Neither Visionary nor the SBA requested Bank OZK to return the *funds* to the SBA, nor to "return" the incoming ACH *transaction*.

Neither Visionary nor the SBA requested Bank OZK to *remove the funds* from Visionary's account.

The account number and name on the account for Visionary matched up with the information that the SBA provided in the incoming ACH transaction such that there was no reason that the incoming ACH could not be "settled" (completed). (*Compare* Doc. 13-15 (Visionary Account Statement) and Doc.18-3 (SBA ACH Receipt).)

On May 26, 2021, Bank OZK sent $2.86 million from Bank OZK's own (general) account to the SBA via a second ACH. (*See* Doc. 18-9 at p. 656, ll. 19-25; p. 658, ll. 2-9.)

## F.    The District Court Proceeding

On December 15, 2023, Visionary applied to The Superior Court of Fulton County, Georgia to vacate the Award.  (*See* Doc. 1-1; Doc. 7.) On January 2, 2024, Bank OZK removed the case to the United States District Court for the Northern District of Georgia. (Doc. 1.)

The issues before the District Court included which law applied (federal or state), whether the arbitration was binding, and whether the arbitration Award should be vacated or confirmed.  Pages 13-15 of the Order are directed to whether the

arbitration Award in this case should be vacated or confirmed. (Doc. 28 at 13-15.) The District Court did not assess the limits of the Panel's power and did not compare those limits with the actions of the Panel. (*Id.*)

### G.   Notice of Appeal

On March 1, 2025, Visionary filed a notice of appeal. (Doc. 31.)

## IV.  STANDARD OF REVIEW

This Court reviews a district court's finding of whether arbitrators "exceeded their powers" under Section 10(a)(4) of the Federal Arbitration Act *de novo*. *Wiregrass Metal Trades Council AFL-CIO v. Shaw Envtl. & Infrastructure, Inc.,* 837 F.3d 1083, 1087 (11th Cir. 2016). Thus, the fact that the District Court addressed Section 10(a)(4) of the Federal Arbitration Act in some manner does not require this Court to afford any deference to that aspect of the Order. Moreover, where the District Court failed to even assess the limits of the Panel's powers and failed to compare those limits with the actions of the Panel, or applied an inappropriate legal test, a *de novo* review is also appropriate on such grounds.

## V.  SUMMARY OF THE ARGUMENT

Setting aside or overturning an arbitration award through resort to the courts is very difficult.  Many try, few succeed. Indeed, it is difficult because the courts will vacate or reverse an arbitration award only upon narrow circumstances. This is one of the few cases where the award must be set aside or reversed.

At its factual core, this is a simple case. Visionary, a customer of Bank OZK, received nearly $3,000,000 via an ACH transaction. Once the money was deposited into Visionary's account, by law, legal title to the money was transferred from the sender to Visionary. Bank OZK, acting on a mistaken suspicion of the potential for fraud, unilaterally confiscated the funds from Visionary's account *after* title to the funds had vested in Visionary. Bank OZK has not given the funds back to Visionary. Disregarding the Account Agreement, the arbitration Panel sided with Bank OZK (thereby disregarding the finality of payments under UCC-4A) and the District Court confirmed the Award.  This appeal followed.

The District Court committed reversable errors by failing to assess the scope of the powers conveyed to the Panel via Bank OZK's Account Agreement with Visionary and by failing to assess whether the Panel exceeded those powers.

In the arbitration hearing, the parties did not present the Panel with a question of construction or interpretation of any particular provision of the Account Agreement.  Instead, *Visionary urged the Panel to apply the plain and unambiguous language of the Account Agreement* and to find that Bank OZK had breached the Account Agreement, *while Bank OZK urged the Panel to excuse Bank OZK's conduct owing to what the bank asserted were allowable banking practices --* practices that were *not* stated in the Account Agreement. After the hearing, in its Award the Panel indicated that "NACHA rules" applied and denied Visionary's

claim by finding that Bank OZK had acted "reasonably". The Panel made no finding of whether Bank OZK had complied with or breached the Account Agreement.

The Account Agreement at suit is a "contract of adhesion" in that Bank OZK set the terms of the Account Agreement and the typical customer has no ability to modify the terms. The dispute surrounds an incoming "ACH" transaction and the bank's subsequent confiscation of the funds in the Visionary's account. The Account Agreement specifies that ACH transactions are governed by UCC Article 4A.

For things as important as freezing the account or the ultimate action of removing money from the account and handing it over to a third party, the Account Agreement specifies under what circumstances those actions can be taken by the bank. For example, the Account Agreement gives the bank the right to transfer the account holder's funds to a third party pursuant to a legal process, such as a court order. The Account Agreement also gives the bank the right to place a *freeze* or hold on the customer's account *if the bank suspects fraud*. Further, the Account Agreement also gives the bank the right to place a freeze or hold on the customer's account to allow time for an adverse claim to the funds to be adjudicated.

In direct contradiction to these plain and unambiguous provisions, the Arbitration Panel created a new remedy for the bank to escape liability for confiscating and irretrievably transferring the account holder's funds to a third party without the knowledge or permission of the account holder, on a mere suspicion of

potential fraud. This new right is nowhere found in the Account Agreement between the parties, contradicts plain and unambiguous provisions in the Account Agreement, and was conjured from whole cloth by the Panel. Indeed, *the Account Agreement only allows the bank to **freeze** the funds, not to **seize** the funds in the absence of a court order*. As such, the Panel exceeded the scope of its powers given to them under the arbitration clause of the Account Agreement.

Further, the written Account Agreement existed in a multi-part written document drafted by Bank OZK. That Account Agreement specifically references UCC Article 4A and specifies how it is to be applied in the Account Agreement. Thus, the Account Agreement was a two-document contract[3] (the written Account Agreement plus the external item of Article 4A of the UCC). The Panel converted the two-document Account Agreement into a three-document contract, despite the fact that the third item (the "NACHA rules") *is **not** mentioned in the Account Agreement*. The District Court failed to assess whether the Panel's conversion of the two-document contract into a three-document contract exceeded the Panel's powers.

Moreover, the Panel then proceeded to focus on the NACHA rules, *to the exclusion of the actual Account Agreement*.  In this, the District Court also failed to

---

[3] For ease of reference, we are referring to the Account Agreement as one document. But of course, the Account Agreement itself was multiple Bank OZK disclosure documents merged into one Account Agreement, as noted in the facts.

assess whether such actions by the Panel exceeded the Panel's powers under the Account Agreement.

Bank OZK acted, and still acts, as if the funds in Visionary's account were not the legal property of Visionary. The SBA sent $2,860,000 to Visionary by way of an electronic transfer known as an "ACH", which is akin to electronically sending cash. Prior to initiating the transfer, the funds belonged to the SBA. After the funds were transferred to Visionary's account, Visionary had legal title to (owned) the funds. The actions of Bank OZK that gave rise to this dispute all occurred <u>after</u> Visionary had acquired legal title to the funds and the bank had no legal right to confiscate the funds, absent a court order. <u>The bank had no right under the Account Agreement to confiscate the funds</u>.[4]

The Panel's Award appears to be premised on an unstated perception by the Panel that at the time of Bank OZK's confiscation of the funds from Visionary's account, the money belonged to the SBA, not to Visionary. But that premise is false, as will be seen later in the Brief.

The District Court, in reviewing the actions of the arbitration Panel, focused solely on whether the Panel had *interpreted* the Account Agreement. Finding that

---

[4] Indeed, no law or rule allows (and the Panel never identifies any law or rule that allows) Bank OZK to unilaterally confiscate an accountholder's funds on a mere suspicion of potential fraud -- that would take a court order. The confiscation might even be considered theft.

the Panel *had engaged in some sort of contract interpretation*, the District Court denied the vacatur motion and affirmed the Panel's Award, without assessing the scope of the Panel's powers under the Account Agreement and without assessing whether the Award exceeded those powers.

Thus, the District Court failed to properly assess whether the Panel exceeded its powers. The District Court also erred by applying the *wrong legal test* in its review of the Panel's Award.

## VI.  ARGUMENT

### A.    District Court Made No Inquiry Into the Panel's Powers, Nor Whether Those Powers Were Exceeded

A bank customer expects that, in the grand scheme of things, the bank will function to protect the customer's money and make the money available to the customer when the customer needs to use it. Indeed, that is why people use banks.

For actions as consequential as Bank OZK freezing an account or the ultimate action of Bank OZK unilaterally removing money from an account and handing it over to a third party, the Account Agreement spells out under what *limited* circumstances those *significant* actions can be taken by Bank OZK.

The District Court, in addressing Section 10(a)(4) of the FAA, focused solely on whether the arbitration Panel interpreted the contract at all and concluded that an arbitration award "even arguably construing or applying the contract" must stand. See page 14 of the Order, quoting *Eastern Associated Coal Corp. v Mine Workers*,

531 U.S. 57, 62 (2000).[5]  Thus, according to the District Court, the Panel Award could not be set aside under Section 10(a)(4) of the FAA **because "the three-arbitrator panel squarely 'interpreted the parties' contract' and applicable law"** (emphasis added), citing *Oxford Health Plans LLC v Sutter* 569 U.S. at 569. *Id*.  But *Sutter* is inapplicable here.

First of all, in *Sutter*, the underlying contract specified that "No civil action concerning any dispute arising under this Agreement shall be instituted before any court, and all such disputes shall be submitted to binding arbitration…". *Sutter* at 566.  Thus, the *Sutter* parties had agreed that all disputes*, including interpretation of the contract itself*, were to be arbitrated.  Moreover, the specific question before the *Sutter* arbitrator was whether the contract authorized class arbitration and *the parties had specifically agreed that the arbitrator should decide that threshold question*. *Id*. In the words of Justice Kagan, "Because the parties 'bargained for the arbitrator's constructions of their agreement', an arbitral decision 'even arguably construing or applying the contract' must stand". *Id*. at 569. In *Sutter*, there was no question about whether the arbitrator exceeded the scope of his power since the narrow question he

---

[5] The language in such a test has roots in collective bargaining agreement cases, which have different circumstances and different policy considerations than at play in the instant case, as will be detailed later in this Brief. Furthermore, the case cited by the district court involves *parties that explicitly agreed to have the arbitrator interpret the arbitration agreement*.

resolved was the very question that was put to him by special agreement of the parties. Such is <u>not</u> the case here.

In this case, no one bargained for this Panel to construe the Account Agreement – *no such power was conveyed to the Panel in the Account Agreement or otherwise*. As a result, whether the Panel construed the Account Agreement in some manner or other *is not the proper inquiry or at least is not the end of the inquiry*. Further, that type of inquiry has its foundation in the collective bargaining agreement cases in the "Steelworkers Trilogy" from the Supreme Court in 1960, based on industrial relations circumstances nowhere found in the present dispute.

The Supreme Court has held on several occasions that while, generally speaking, a court may not substitute its own judgment for that of a labor arbitrator or even an arbitrator in a commercial dispute, nonetheless the arbitrator has to limit the award to what is in the contract. In the context of the CBA cases, the award has to "draw its essence from" from the CBA. In ordinary commercial contract disputes, the award cannot ignore the plain language of the contract.

The labor arbitration trilogy, commonly referred to as the "Steelworkers Trilogy," consists of three landmark Supreme Court cases decided June 20, 1960: *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960);

and *United Steelworkers of America v. Enterprise Wheel & Car Corp*., 363 U.S. 593

(1960).

In *United Steelworkers of America v. Enterprise Wheel & Car Corp*., 363 U.S.

593, a CBA provided that a labor arbitrator was to interpret the CBA and the Court

held it "is the arbitrator's construction which was bargained for…and courts have

no business overruling him because their interpretation of the contract is different

from his." *Id*. at 599. But the Supreme Court also ruled that:

> . . . [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate *only so long as it draws its essence from the collective bargaining agreement*. **When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award**.

*Id*. at 597 (emphasis added)

In *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, the

Supreme Court spoke about the different approaches to deference courts should take

between arbitrations in labor union (CBA) cases and regular commercial disputes:

> In the commercial case, arbitration is the substitute for litigation. Here [a CBA case] arbitration is the substitute for industrial strife. … arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement…

363 U.S. at 578.

Thus, in labor union cases (CBA cases), courts are confined to assessing

whether the award "draws its essence" from the CBA and whether the arbitrator

exceeded their authority. This principle ensures that arbitration remains an efficient and final mechanism for resolving labor disputes, free from excessive judicial interference.

In *First Options of Chicago, Inc. v Kaplan*, the Supreme Court held in a regular commercial contract dispute that where one of three debtors agreed to arbitration and the other two did not, the arbitrator lacked power under the underlying agreement to award that all three can be forced to arbitrate the claims. Thus, the arbitrator's award was reversed.  514 U.S. 938 (1995).

In *Stolt-Nielsen*, the parties' underlying contract had a mandatory arbitration clause (all claims must be arbitrated).  The parties reached a supplemental, voluntary agreement for the arbitration panel to determine whether the underlying agreement allowed for class arbitration. In setting aside the award, the Supreme Court noted that the panel had strayed from interpreting the contract (*and it was asked to interpret the contract*) and had dispensed its "own brand of industrial justice", stating "In this case, we must conclude that what the arbitration panel did was simply to impose its own view of sound policy regarding class arbitration." *Stolt-Nielsen S.A. v AnimalFeeds Int'l Corp*., 559 U.S. 662 (2010).

Thus, under Supreme Court precedent, the Panel here was not empowered to do whatever it wanted in the Award, and in finding for the bank in plain

contravention to the clear provisions of the Account Agreement the Panel exceeded its authority.

This Court also has consistently limited arbitral power to that conveyed to the arbitrator by contract. For example, in *Butterkrust Bakeries*, this Court *affirmed vacatur* by a district court of an arbitrator's award in a CBA case as exceeding the arbitrator's powers where the CBA provided that the company was to retain sole control of employee discipline and the arbitrator imposed his own discipline on the employee. *Butterkrust Bakeries v Bakery, Confectionery and Tobacco Workers Int'l.*, 726 F.2d 698 (11th Cir. 1984).

In *Warrior & Gulf Nav* this Court again *affirmed vacatur* by a district court of an arbitrator's award in a CBA case as exceeding the arbitrator's powers where the contract clearly requires a certain result upon a particular circumstance and the arbitrator, having found the particular circumstance, failed to award the certain result. This Court held that the arbitrator had no discretion to make an award to the contrary. *Warrior & Gulf Nav. Co. v United Steelworkers of America,* 996 F.2d 279 (11th Cir. 1993).

In *Wiregrass Metal Trades Council AFL-CIO v. Shaw Envtl. & Infrastructure, Inc.,* this Court applied both the "even arguably interpreted the contract" standard along with the standard that the "arbitrator may not ignore the plain language of the contract". In *Wiregrass*, the decision ultimately turned on whether the Court

believed that the arbitrator's decision was "an *interpretation* of the collective bargaining agreement *or a modification* of it". Finding that the collective bargaining agreement was at least partially ambiguous, this Court held that the arbitrator had *interpreted* the contract, *not modified it*, and thus this Court upheld the arbitral award. *Wiregrass Metal Trades Council AFL-CIO v. Shaw Envtl. & Infrastructure, Inc.,* 837 F.3d 1083, 1087 (11th Cir. 2016). But that decision easily could have gone the other way.[6]

In *Szuts v Dean Witter Reynolds, Inc.*, this Court vacated an arbitration panel's award (and reversed a district court), concluding that the panel's award exceeded the authority granted to the panel under the arbitration agreement. In *Szuts*, the arbitration agreement required *at least three members in such a panel* and the arbitration was conducted before *only two panel members*. As a result, this Court found that the panel "exceeded their authority" and vacated the award of the panel. *Szuts v Dean Witter Reynolds, Inc.,* 931 F.2d 830 (11th Cir. 1991).

---

[6] *See also Gherardi v Citigroup Global Mkts.*, where this Court upheld an arbitration award (and reversed a district court's vacatur). Two members of this Court found the arbitrators had not exceeded their authority, stating that the arbitrators only interpreted the contract and had not "flagrantly defied" the terms of the contract.  On the other hand, the District Judge and one dissenting Circuit Judge reached the opposite conclusion. Thus, this case also could have easily reached an opposite result.  975 F.3d 1232 (11th Cir. 2020).

Thus, under Supreme Court precedent, as well as this Court's precedent, the Panel's Award in this case is to be measured against the powers granted to the Panel by contract, whatever those powers may be.

In this regard, the District Court failed to determine if the Panel exceeded its authority by assessing whether the Award is something that is permissible under the Account Agreement or whether it is something that the Panel conjured in dispensing its own form of commercial justice. As will be seen below, fashioning a remedy that is nowhere contemplated by the Account Agreement or which directly contradicts the plain, unambiguous language of the Account Agreement, or which ignores such plain, unambiguous language of the Account Agreement are ways in which an arbitrator can exceed her authority.

The arbitration Panel ultimately awarded that Bank OZK is free from liability for removing nearly three million dollars of funds owned by Visionary from Visionary's account, without a court order, and sending the money irretrievably to a third party, merely on the bank's mistaken suspicion of a *potential* for fraud. The District Court upheld the Award's grant of this new remedy to excuse Bank OZK's unilateral confiscation of account funds owned by Visionary and sending the money to a third party. In doing so, the District Court focused on whether the Panel even arguably interpreted the Account Agreement and failed to consider whether the

remedy (award) exceeded the scope of the Account Agreement. Such a failure by the District Court was error.

## B. The Panel Exceeded its Powers by Making an Award That Contradicts and/or Ignores the Plain Language of the Account Agreement

The FAA empowers a district court to vacate an arbitration award if it finds that "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *9 U.S.C. Section 10(a)(4)*. Those powers are, in turn, defined by the parties' contractual agreement to arbitrate. *See Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp., 559 U.S. 662, 682-83, 130 S.Ct. 1758, 1774, 176 L. Ed. 2d 605 (2010)* ("[A]n arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution."). "Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995).*

Had the District Court made the proper assessment, it would have found that the Panel exceeded its powers. In the present dispute, Par. 10 of the Account Agreement plainly spells out that Bank OZK can place a freeze on an account when the bank suspects potential fraud. Yet, Bank OZK not only froze the account, Bank OZK also *confiscated* the nearly $3M in the account.

Par. 30 of the Account Agreement plainly spells out that Bank OZK can act unilaterally and give the customer's money to a third party if ordered to do so by a court (what it termed "legal action"). (Doc. 13-8 ¶30.) Yet, Bank OZK confiscated the nearly $3M in the account without any court order or "legal action".

Par. 37 of the Account Agreement also provides that when there is a dispute, Bank OZK might place a hold on an account to allow time for a legal proceeding to resolve the dispute. (*Id.* ¶37.) Again, Bank OZK not only froze the account, it also confiscated the nearly $3M in the account.

Nothing in the Account Agreement expressly mentions any possibility that Bank OZK might confiscate money from the customer's account without the customer's consent, other than in Par. 30 pursuant to a court order. *Nowhere in the Account Agreement is the customer, here Visionary, made aware that the bank might do such a **consequential** thing.* There certainly was no meeting of the minds on the idea of Bank OZK confiscating the funds without a court order, for if such a thing had been mentioned in the Account Agreement in any way, it certainly would have given this customer, and perhaps every customer, serious pause before agreeing to such an Account Agreement.

Thus, the arbitration Panel exceeded its authority by ignoring the express language of the Account Agreement and conjuring an award not mentioned in nor

contemplated by the Account Agreement, an award that is directly contrary to the unambiguous language of the Account Agreement and this Court should so find.

## C. The Panel Exceeded its Powers by Making an Award That Contradicts a Result <u>Compelled</u> by the Plain Language of the Account Agreement

The Panel found that Bank OZK subjectively had a suspicion of a potential for fraud. (Doc. 12-1 at 17-18.) As such, under the express terms of Par. 10 and Par. 21 of the Account Agreement and under the precedent of *Warrior & Gulf Nav*, the Panel was *compelled* to award that the confiscation of the $2.86M of Visionary's funds was in violation of the Account Agreement. *Warrior & Gulf Nav* stands for the proposition that when the contract clearly requires a certain result upon a particular circumstance, the arbitrator has no discretion to make an award to the contrary. *Warrior & Gulf Nav. Co. v United Steelworkers of America,* 996 F.2d 279 (11th Cir. 1993). Thus, in awarding that Bank OZK had no liability for *confiscating Visionary's funds upon a finding the bank had a suspicion of potential fraud*, the Panel exceeded its authority.

As noted above, when the contract language is clear, the arbitrator is *compelled* to apply the Account Agreement, not to reimagine it. In this case, the Account Agreement has a clear "if X, then Y" provision. The Panel specifically found that Bank OZK had a suspicion of potential fraud, *forcing* the Panel to award that *freezing* the account was permissible under the Account Agreement and that *seizing* the funds was not. **Indeed, the Account Agreement allows for freezing the**

***funds, not seizing the funds***. Since the Panel found "X", the Panel had no choice but to award "Y". In this regard, the Panel exceeded its powers and was compelled to find that seizing the funds was not permitted. In this way, the Panel also exceeded its authority, and this Court should so find.

**D.    The Panel Exceeded its Powers by Applying the "NACHA Rules" Instead of the Actual Account Agreement, Despite the Term "NACHA" Not Appearing in the Account Agreement**

The Panel found that Visionary had agreed to be bound by "NACHA rules" and then proceeded to make an award for the bank without identifying any particular NACHA rule that allows Bank OZK to confiscate money belonging to Visionary. (Doc. 12-1 at 14-15, 17.) *But Visionary did no such thing – it did **not** agree to be bound by "NACHA rules".* Indeed, the term "NACHA" does not even appear in any part of the Account Agreement, nor does the phrase "NACHA rules". *Instead, the Account Agreement states specifically that UCC Article 4A applies – and does so twice.* Yet, instead of relying on UCC Article 4A as stated in the Account Agreement, the Panel relied on "NACHA rules" in making its award for the bank, again without identifying any particular NACHA rule that allows the bank to confiscate Visionary's $2.86M.

Par. 21 of the Account Agreement bears the heading "ACH and Wire Transfers". (Doc. 13-8 ¶21.) The first sentence thereof specifically states that "Article 4A of the Uniform Commercial Code" applies. (*Id.*) The paragraph also

states that "You agree to be bound by automated clearing house association rules", without identifying which particular set of clearing house association rules are to be used and without identifying which particular rule(s) of such a set of clearing house association rules are to be applied. (*Id.*) There is nothing in the record to show that there is only one "clearing house association", such that the rules of multiple different associations could be referred to by the passage in the Account Agreement. Then the paragraph goes on to refer to "Article 4A-403(a) of the Uniform Commercial Code" in relation to payments. (*Id.*) So, paragraph 21 *twice expressly refers to UCC Article 4A* and only obliquely refers to some non-descript "automated clearing house association rules". The question then becomes which of these potential referential phrases are sufficient to incorporate some external document into the agreement?

In *Global Quest, LLC v. Horizon Yachts, Inc*., this Court held that a collateral document is deemed to be incorporated by reference into a contract if the contract "(1) specifically provide[s] that it is subject to the incorporated [collateral] document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained."   849 F.3d 1022, 1033 (11th Cir. 2017) (citing *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC,* 62 So. 3d 1192, 1194 (Fla. Dist. Ct. App. 2011). According to the *Global Quest* court, the first requirement mandates that "there must

be some expression in the incorporating document . . . of an intention to be bound by the collateral document." *Id.* As to the second requirement, "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Id.* (quoting *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990)).

Here, the UCC Article 4A document is *specifically* identified twice and there is language in the contract identifying its application.  By contrast, not only is the document "NACHA rules" not mentioned in the Account Agreement, only the non-descript phrase "automated clearing house association rules" is mentioned without identifying which set of association rules this refers to and without identifying which particular rule(s) of that unnamed association are to be incorporated by reference. Under *Global Quest*, here only Article 4A of the UCC can be incorporated by reference and the "NACHA rules" cannot.

The Panel grounded its Award on the purported agreement by Visionary to be bound by the "NACHA rules", to which Visionary most certainly did not agree. In this regard, the Panel exceeded its authority as well by incorporating the entire (unnamed) set of "NACHA rules".

Pictured below is a graphical representation of the Account Agreement. As shown, the Account Agreement incorporates UCC Article 4, such that the Account Agreement is a "two-document" contract where the second item is UCC Article 4A.



The Panel ruled that the "NACHA rules" are part of the Account Agreement (again, despite the fact that the Panel was not empowered to construe the Account Agreement and despite the fact that the term "NACHA" does not appear anywhere in the Account Agreement). According to the Panel's construction of the Account Agreement, the Account Agreement is a *three-document* contract as depicted below:



However, the Panel also ruled that UCC Article 4A was trumped by the "NACHA rules" (even though O.C.G.A § 11-4A-404(c) provides that "the right of the beneficiary to receive payment and damages as stated in [O.C.G.A § 11-4A-404(a)] may not be varied by agreement or a funds-transfer system rule.") and ignored the unambiguous language of the Bank OZK Account Agreement document, leaving only the NACHA rules to decide the matter. See the below representation:



This is the worst sort of bootstrapping. *The Panel made its award based on the "NACHA rules" rather than the actual Account Agreement.* This graphical representation and explanation further illustrate that the Panel exceeded its authority – the Panel had no power to interpret the Account Agreement, let alone in such a capricious manner. Indeed, if one were to apply the extremely deferential standard from the collective bargaining agreement cases (issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract), the award must be set aside or reversed. *Indeed, it is hard to imagine how one could look at how the Panel transformed the question from applying the bank's Account Agreement into ignoring that Account Agreement and exclusively applying the "NACHA rules" and then conclude that the resulting award draws it essence from the Account Agreement.* Yes, under even the more deferential standard applied in CBA cases, these facts demand vacatur or reversal.

**E.    The Panel Exceeded its Powers by Construing the Account Agreement At All**

**1.    Bank OZK's Account Agreement Imparted No Power to Construe the Account Agreement, Nor Did the Arbitration Rules**

The Account Agreement that Bank OZK forced on its customers, including Visionary, does not contain any provision spelling out that in an arbitration proceeding over the Account Agreement, the arbitrator would be expected to or required to construe or interpret the Account Agreement. *The Bank OZK Account Agreement contains no such provision*. Instead, the Account Agreement merely states:

> You or we may require that any controversy or claim relating to this agreement, or breach of it be resolved through arbitration . . . .

> (*See* Doc. 13-9 paragraph labeled "Arbitration".)

The American Arbitration Association (AAA) promulgates "standard" arbitration clauses for parties to incorporate into agreements to trigger arbitration. *See* AAA-ICDR® Clause Drafting, https://www.adr.org/Clauses (last visited May 21, 2025.

For "commercial" contracts, the AAA standard clause makes no mention of any power to construe or interpret the contract. *Id.*

For labor contracts, the AAA standard arbitration clause states, "Any dispute, claim, or grievance arising from or relating to the ***interpretation*** *or application* of this agreement shall be submitted to arbitration." *Id.* (emphasis added).

Thus, the AAA suggests two types of standard clauses: standard clauses which include a specific phrase evincing empowerment for the arbitrator to *interpret* the contract, and standard clauses that do not include a specific phrase evincing empowerment for the arbitrator to interpret the contract. *Id.* Here, *Bank OZK chose* language that does not empower the Panel to interpret the contract and also made the arbitration non-mandatory. *Compare* Doc. 13-9 paragraph labeled "Arbitration" and AAA-ICDR® Clause Drafting, https://www.adr.org/Clauses. Since Bank OZK drafted this contract of adhesion, any doubt in the contract is to be resolved *against* Bank OZK. Thus, *the Bank OZK Account Agreement contains no provision empowering arbitral interpretation of the Account Agreement.*

After the dispute arose, the parties voluntarily sought resolution through arbitration via the AAA. Leading up to the arbitration, including through the hearing, the parties did not discuss between themselves having the Arbitration Panel interpret the Account Agreement. Thus, the parties reached no such agreement. The parties also did not discuss this with the Arbitration Panel prior to the hearing. As a result, there was no agreement with the Arbitrators or between the parties empowering the Arbitrators to construe the Account Agreement. *There is no arbitration agreement empowering the panel to interpret the Account Agreement and the Award doesn't mention any such arbitration agreement.* (*See* Doc. 12-1.)

**2.      Unlike in Collective Bargaining Agreement Arbitrations, Here the Panel Was Given No Power to Interpret the Account Agreement**

The Panel should have *applied* the Account Agreement to whatever facts it found, not unilaterally chosen to *construe* the Account Agreement (and to such an extent that it became unrecognizable).   And the District Court, in confirming the Panel's award, specifically found that the Panel "construed the parties' contract". Order at page 14.  Thus, *since the Panel was given no power to construe the Account Agreement, the District Court's finding that the Panel construed the contract firmly establishes that the Panel exceeded its powers*. On this basis at least, the Award must be vacated and/or reversed. *See Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830 (11th Cir. 1991).

If the Court finds that the Panel had not been empowered to *construe* the Account Agreement, since there was no agreement to do so and the parties had not asked for the Account Agreement to be interpreted, the task then was for the Panel to *apply* the Account Agreement.  In reviewing whether the Panel exceeded their authority in even doing that, the test should be whether the Panel arguably applied the Account Agreement. Normally, such would result in an affirmance straightaway. *But here, the Panel didn't even do that.  The Panel applied the NACHA rules, not the Account Agreement, in determining the rights and obligations of the parties*. In this way, the Panel ignored the Account Agreement and certainly didn't apply it (not even arguably).

Thus, the District Court committed reversible errors when it improperly affirmed the arbitration award by (1) failing to assess the scope of the powers conveyed to the arbitrators via Bank OZK's Account Agreement with Visionary and by failing to assess whether the arbitrators exceeded those powers; and (2) by applying an inappropriate legal test (one derived from judicial reviews of arbitrations of collective bargaining agreements where the parties agreed to have the arbitrator interpret the Account Agreement, not from reviews of arbitrations of ordinary commercial contracts in which there was no such agreement to have the contract *interpreted* by an arbitrator).

The Award also must be set aside as the Panel didn't even *apply* the Account Agreement.

**F.  The *Funds* Belonged to Visionary, Not to Bank OZK or the SBA, When Bank OZK Confiscated the Funds from Visionary's Account**

**1.  UCC Article 4A Controls When Title Passed to Visionary**

As to the ACH transaction originated by the SBA for the benefit of the Visionary, UCC-4A controls – not Bank OZK's Account Agreement - because, as discussed below, *UCC-4A is the exclusive means of determining the rights, duties and liabilities of the affected parties* in any situation covered by the particular provisions of UCC-4A. Bank OZK's Account Agreement cannot define the ownership rights as between the SBA and Visionary when the SBA sent the funds to Visionary via an ACH. Under UCC-4A, title passed to Visionary at a certain point

and nothing in Bank OZK's Account Agreement can change those ownership rights as between the SBA and Visionary. Thus, the Panel was not empowered to make any determination with respect to ownership of the funds based on the incoming ACH. As discussed in more detail below, based on the Panel's fact findings, title to the funds passed to Visionary *before* Bank OZK confiscated the funds.

UCC Article 4A controls the rights of the sender and recipient of ACH transactions and establishes that the *funds* belonged to Visionary (Visionary had legal title thereto) on May 24, 2021, or at the very latest on May 25, 2021. Either way, when Bank OZK removed the funds from Visionary's account on May 26, 2021, those funds belonged to Visionary, not to the SBA or to Bank OZK.

UCC Article 4A "represent[s] a careful and delicate balancing of [the competing interests - those of the banks . . . . and the commercial and financial organization . . . as well as the public interest] and [is] intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by the particular provisions of the Article." *Ga. St. U.L. Rev.* 163, 164 (1992); see also, *Studco Bldg. Sys. US, LLC v 1st Advantage Fed. Credit Union*, 2025 U.S. App. LEXIS 6999 (4th Cir. 2025) ("Article 4A of the Uniform Commercial Code defines the exclusive rights and duties of financial institutions with respect to such funds transfers."); *Aleo Intl. v. Citibank*, 612 N.Y.S.2d 540 (1994). *Indeed, this is yet another way that the Panel exceeded it powers* in deciding

that the provisions of UCC Article 4A do not apply and that the unstated, unidentified "NACHA rules" trump UCC Article 4A and that NACHA controls the rights of the SBA, Visionary, and Bank OZK in this dispute.

The proposition that UCC Article 4A is the exclusive tool for defining the rights of account holders regarding ACH transactions *is not controversial*, as all 50 states have adopted UCC Article 4A, including Georgia. Furthermore, O.C.G.A § 11-4A-404(c) provides that "the right of the beneficiary to receive payment" under O.C.G.A § 11-4A-404(a) "*may not be varied by agreement or a funds-transfer system rule*." O.C.G.A § 11-4A-404(c) with its prohibition against varying the right of the beneficiary to receive payment effectuates the stated public policy of UCC-4A *for predictability and finality*. See, e.g., *Bayerische Hypo-Und Vereinsbank AG v. HSBC Bank USA, N.A.*, 2015 N.Y. Misc. LEXIS 2602, *11.

Pursuant to UCC-4A, *title to funds* received via an ACH transaction transfers to an accountholder when the beneficiary bank "accepts" the transaction. *Zeal Global Servs. Private Ltd. v. SunTrust Bank,* 508 F.Supp.3d 1303, 1315 (N.D. Ga. 2020)(holding "[A]t the time the payment orders are accepted, title passes to the recipient of a wire transfer.")

As the Fourth Circuit said in *Studco*,

The ACH (Automated Clearing House) system, in which virtually every U.S. bank participates, functions electronically and automatically, processing over 33 billion transfers of funds among financial institutions each year, involving over $86 trillion. It is

essential to the strength and efficiency of national commerce, for if those transfers were conducted manually, commerce would virtually grind to a halt. Article 4A of the Uniform Commercial Code defines the exclusive rights and duties of financial institutions with respect to such funds transfers. In this appeal, we apply those principles to resolve the parties' rights and duties where payment orders for the transfers of funds misdescribed the account into which the funds were to be deposited.

*Studco Bldg. Sys. US, LLC v 1st Advantage Fed. Credit Union*, 2025 U.S. App. LEXIS 6999 (4th Cir. 2025).

Thus, ACH transfers are fast and automatic; acceptance occurs automatically and *the transfer of ownership of ACH funds to an accountholder is automatic*. Under UCC-4A, generally speaking, the originator issues a payment order to the originating bank to transfer funds to the beneficiary's bank for deposit into the beneficiary's account. The funds are considered owned by the beneficiary once they are credited to the beneficiary's account, provided there are no misdescriptions (of account number or account holder name) or disputes regarding the payment order. *Studco Bldg. Sys. US, LLC v. 1st Advantage Fed. Credit Union*, 2025 U.S. App. LEXIS 6999 (4th Cir. 2025).

Georgia Commercial Code § 11-4A-209(b) provides that "a beneficiary's bank accepts a payment order at the *earliest* of the following times: (1) *When the bank pays the beneficiary* as stated in Code Section 11-4A-405(a) or 11-4A-405(b), . . . (2) *When the bank receives payment* of the entire amount of the sender's order . . . ." Georgia Commercial Code § 11-4A-405(a) provides that "If the beneficiary's

bank credits an account of the beneficiary of a payment order, payment of the bank's obligation under Code Section 11-4A-404(a) occurs when and to the extent . . . . funds with respect to the order are otherwise made available to the beneficiary by the bank." See, e.g., *Aleo Intl. v. Citibank*, 612 N.Y.S.2d 540 (1994).[7] Thus, under Georgia UCC-4A, acceptance occurs the earlier of when the beneficiary bank (1) receives payment or (2) pays the beneficiary. The Panel found that Bank OZK received the $2.86 million for the incoming ACH from the U.S. Treasury on May 25, 2021 (*see* Ex. A p. 9), and the Panel also found that Bank OZK paid Visionary on the morning of May 24, 2021 (*Id.* at 10, 20). Accordingly, acceptance occurred on May 24, 2021 (or at the latest May 25, 2021).

The Panel found all of the elements of acceptance pursuant to O.C.G.A. § 11-4A-209. The Panel found that "[Bank OZK] *made the V-ACH funds available* to Visionary on the morning of May 24, 2021 . . . . Indeed, Ms. Rolle testified that she saw the $2.86 million in the Visionary account when she logged in online to the account on the morning of May 24, 2021." (*Id.* at 20.) The Panel also found that

---

[7]*Zeal Global Servs. Private Ltd*., 508 F.Supp.3d at 1318, n. 3 ("Because all fifty states have adopted the U.C.C., 'decisions from other jurisdictions interpreting the same uniform statute are instructive.'")(citing *In re Pillowtex, Inc.*, 349 F.3d 711, n. 8 (3d Cir. 2003) ; *In re QDS Components, Inc.*, 292 B.R. 313, n. 3 (W.D. Ohio 2002) ("Because the U.C.C. is a uniform law, decisions from other state and federal courts [interpreting the U.C.C.] also may be considered."); *In re Grubbs Cont. Co.*, 319 B.R. 698, 712 (M.D. Fla. 2005)

"Bank OZK received the $2.86 million for the V-ACH from the U.S. Treasury on May 25, 2021" (*Id.* at 16).

Accordingly, *based on the Panel's findings*, Bank OZK accepted the funds under O.C.G.A. § 11-4A-209(b)(1) on the morning of May 24, 2021, when Bank OZK credited Visionary's account and made the funds available to Visionary on May 24, 2021. *See* Ex. A at p. 10, 20. Alternatively, *based on another of the Panel's findings*, according to O.C.G.A. § 11-4A-209(b)(2), Bank OZK accepted the SBA ACH Funds Transfer on May 25, 2021, when Bank OZK received the $2.86 million on that date. Either way, by May 24 or May 25 of 2021, Visionary owned the funds.

Once Bank OZK accepted the funds, Bank OZK was obligated to pay Visionary.  See O.C.G.A § 11-4A-404(a).  O.C.G.A § 11-4A-404(a) provides that "if a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order."

As discussed above, O.C.G.A § 11-4A-404(c) provides that "the right of the beneficiary to receive payment" under O.C.G.A § 11-4A-404(a) "may **not** be varied by agreement or a funds-transfer system rule."  *Indeed, the Account Agreement crafted by Bank OZK confirms that UCC Article 4A controls*. More specifically, Paragraph 21 of the bank's Account Agreement, provides that "This agreement is subject to Article 4A of the Uniform Commercial Code – Fund Transfers as adopted in the state in which you have your account with us." (Doc. 13-8 ¶21.) Thus, Bank

OZK has agreed that Article 4A of the UCC controls ACH transactions for the customer.

The reason for the framework as set forth in Article 4A of the Georgia Uniform Commercial that the bank is obliged to pay the beneficiary upon acceptance is *so that disputes such as the present dispute do not arise*. *Finality and predictability* in the transactions are some of the primary goals of the code section.

The funds belonged to Visionary before and when Bank OZK improperly confiscated the funds unilaterally -- the bank owes the funds back to Visionary under the Account Agreement and the UCC.

### 2. The Panel's Findings Establish That Visionary Had Title to the Funds as Early as May 24 or May 25, 2021

The findings of the Arbitration Panel firmly establish that, under the Account Agreement, title to the funds in Visionary's account had already transferred to Visionary by the time Bank OZK removed the funds from Visionary's account. More specifically, the Panel found that:

(1) Bank OZK received the $2.86 million incoming ACH credit entry *transaction* on the morning of May 24, 2021 (Doc. 12-1 at 9);

(2) Bank OZK promptly placed $2.86M in *funds* in Visionary's account on the morning of May 24, 2021 (in anticipation of the funds actually arriving soon from the SBA pursuant to the ACH credit entry transaction) and made the *funds* available to Visionary on the morning of May 24, 2021 (*Id.* at 20);

(3) Bank OZK actually received the $2.86 million of *funds* for the incoming ACH from the U.S. Treasury on May 25, 2021 (*Id.* at 16);

(4) The ACH credit entry transaction was *settled* on May 25, 2021 (Id. at 18)

As discussed above, these findings conclusively establish that title transferred to Visionary and thus Bank OZK was contractually and legally prohibited from confiscating the funds in Visionary's account without Visionary's consent.

Furthermore, Paragraph 21 of the bank's Account Agreement with the heading "ACH and Wire Transfers" states that "payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code." (Doc. 13-8 ¶21.) Thus, under the Account Agreement, *once an incoming ACH transaction is "settled", the incoming ACH payment is no longer "provisional" – at that point, the customer has legal title under the Account Agreement*. The Panel found that Bank OZK placed the $2.86M in Visionary's account and made the $2.86M available to Visionary on May 24, 2021. The Panel also found that the transaction was "settled" on May 25, 2021. (Doc. 12-1 at 18.) Thus, based on the clear language of the Account Agreement, the funds were in Visionary's account and belonged to Visionary on May 25, 2021.

### 3. The Panel Provides No Reasoning in its Award Regarding the Propriety of Bank OZK Removing Funds from Visionary's Account After Title Had Transferred to Visionary.

The remedy fashioned by the Panel – that Bank OZK can take Visionary's money if the bank has a suspicion of fraud -- is flatly contrary to the Account Agreement and contrary to UCC-4A. The remedy fashioned by the Panel has absolutely no basis in the Account Agreement or the UCC-4A and the Panel explains no basis for it in the Award.

When Bank OZK removed the funds from Visionary's account on May 26, 2021, it did so at its peril.  *See e.g.*, *Bayerische Hypo-Und Vereinsbank AG*, 2015 N.Y. Misc. LEXIS 2602, *17("If the bank were to agree to reverse the transfer, it would do so at its peril — unless the beneficiary were also willing to consent.")(citing *Middle East Banking Co. v State Street Bank Int'l.*, 821 F2d 897, 902 (2nd Cir. 1987)); *Aleo Intl. v. Citibank*, 612 N.Y.S.2d 540 (1994).  As the Second Circuit held in *Middle East Banking v. State Street Bank Intern.*, "Returns and refunds to a third party *that are unauthorized by a customer* give rise to an action against the bank [] and unilateral actions of this nature are undertaken by a bank at its own peril. In an action brought by a bank customer for breach of a deposit contract, it is no defense that the funds in question were deposited in the account by a third person". 821 F. 2d at 901-902 (emphasis added).

As the court in *Bayerische Hypo-Und Vereinsbank AG* (cited by the Georgia court in *Zeal*) explained, "Payments made by electronic funds transfers . . . *are to be the equivalent of cash payments, irrevocable . . . .*" 2015 N.Y. Misc. LEXIS 2602, *12.

As discussed earlier, the Panel completely disregarded the clear language of the Account Agreement which incorporates O.C.G.A § 11-4A-404(a) and O.C.G.A. § 11-4A-209 prohibiting the bank from removing funds from Visionary's account once those funds have been accepted. Furthermore, the Panel also disregarded the clear language of Paragraphs 10, 30, and 37. (Doc. 13-8 ¶¶10, 30, 37.)

The Award is completely silent, except in one footnote, regarding Bank OZK's confiscation of Visionary's funds. *See* Doc. 12-1 n. 13, p. 17. The Panel makes no finding nor provides any reasoning in its Award in any way supporting the potential propriety under the Account Agreement of Bank OZK removing funds from Visionary's account after title had transferred to Visionary. *Indeed, the Panel Award makes no findings at all regarding who owned the funds*. However, as discussed *supra*, the Award's finding of facts provides the factual underpinnings that establish that *Visionary owned the funds*. Thus, the Panel was not empowered to award Visionary's funds to Bank OZK.

**G.    Trying to Make Sense of the Actions of Bank OZK and the Panel**

It appears that Bank OZK and the arbitration Panel were laboring under the false perception that the *funds* did not belong to Visionary and may have still belonged to the SBA.  Viewed through such a prism, the actions of the bank and the Panel are a little easier to grasp.

But the funds ***were*** the legal property of Visionary. The entire ACH system is designed to allow electronic, near-instant transfers of funds.  Prior to sending the money to Visionary, the funds undoubtedly belonged to the SBA.  But once the SBA "hit the send button", a series of events was initiated that transferred legal title in the funds to Visionary.  *That transfer of title occurred when Bank OZK deposited the funds in Visionary's account on the 24th (or at the latest when the funds were received by Bank OZK (on the 25th).*  At that moment, the funds no longer belonged to the SBA – they belonged to Visionary.  And *at no time did the funds **ever** belong to Bank OZK*. Bank OZK's confiscation of Visionary's funds on the 26th was contrary to the Account Agreement and contrary to UCC Article 4A.

In appreciating the significance of this transfer of legal title, it is important to make a distinction between an electronic *transaction* called an "ACH" and the *funds (money)* transferred by that electronic transaction.  Bank OZK has asserted that it has merely "returned" an ACH.  But that is not true – it confiscated *money* that belonged to Visionary and then sent *money* to the SBA.  It did so with its own ACH

to send the same amount of money to the SBA, on its ill-advised adventure, overstepping its boundaries.  The bank didn't confiscate the *transaction*.  It took Visionary's *money*. And it is not up to the bank to determine what to do with Visionary's money. *That is the role of a court* (as acknowledged by Par. 37 of the Account Agreement). *Even law enforcement cannot take an accountholder's funds unilaterally without a court order*.[8]

Bank OZK ought to be embarrassed over its actions.  Sadly, it has forced Visionary to fight and fight, consuming significant time and expense, just to try to recapture what Bank OZK took from Visionary. Indeed, as noted at the outset of this brief, Bank OZK made a mistake and rather than accept the financial loss from that mistake, *Bank OZK wants the blameless customer to take the financial loss for the bank's mistake*. In this regard, Bank OZK has been stubbornly litigious and should be punished accordingly.

## VII.  CONCLUSION

This brief of Appellant Visionary is being filed with the Court today, May 22, 2025, almost exactly four (4) years to the day since the SBA sent the $2,860,000 to Visionary via an ACH as part of a COVID-19 emergency relief program.  Funds that should have been available to Visionary immediately have been wrongly snatched

---

[8]The Constitution, particularly the Due Process Clause of the Fifth and Fourteenth Amendments, protects individuals from the confiscation of their property, including bank account funds, without adequate notice and an opportunity to be heard.

away by Bank OZK.  From May 24, 2021, to the present, Visionary has fought to force Bank OZK to make things right and to give Visionary its money back.

Visionary respectfully asks that the District Court's order be vacated, that the Panel's award be reversed, and that Visionary recover its $2,860,000 from Bank OZK, plus interest and attorneys' fees.

*/s/ Arthur A. Gardner*
Arthur A. Gardner
Georgia Bar No. 283,995
Charlena L. Thorpe
Georgia Bar No. 760954
GARDNER THORPE
2300 Windy Ridge Parkway, SE,
Suite 1135 South
Atlanta, Georgia 30339
(770) 984-2300
ArtG@GardnerIP.com
CharlenaT@GardnerIP.com

*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 12,188 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Arthur A. Gardner*